(Slip Opinion)

# Authority to Withdraw from the North American Free Trade Agreement

The President may lawfully withdraw the United States from the North American Free Trade Agreement without the need for any further legislative action.

October 17, 2018

MEMORANDUM OPINION FOR THE COUNSEL TO THE PRESIDENT

You have asked whether the President may lawfully withdraw the United States from the North American Free Trade Agreement ("NAFTA"), Can.-Mex.-U.S., Dec. 17, 1992, 32 I.L.M. 289 (1993), according to its terms, without obtaining approval from Congress. NAFTA is a congressional-executive agreement, negotiated by the President and approved by Congress. Article 2205 of the agreement permits a party to withdraw from it on six months' notice. In the legislation approving NAFTA, Congress authorized the President to carry out the agreement and imposed no limits on his authority to withdraw. Because the Constitution and the governing statute vest the President with the authority to invoke article 2205 of NAFTA, we conclude that the President may give notice on behalf of the United States to withdraw from the agreement without the need for any further legislative action.[1]

## I.

NAFTA is an international agreement among the United States, Canada, and Mexico that created "a 'free trade zone' on the North American continent through the phased elimination or reduction of both tariff and non-tariff barriers to trade." *Made in the USA Found. v. United States*, 242 F.3d 1300, 1302–03 (11th Cir. 2001). President George H.W. Bush negotiated NAFTA consistent with section 1103(b) of the Omnibus Trade and Competitiveness Act of 1988 ("1988 Act"), Pub. L. No. 100-418, 102 Stat. 1107, 1129–30, which entitled certain trade agreements to the

---

[1] In preparing this opinion, we have solicited and considered the views of the Department of State's Office of the Legal Adviser. *See* Memorandum for Henry C. Whitaker, Deputy Assistant Attorney General, Office of Legal Counsel, from Michael J. Mattler, Assistant Legal Adviser for Treaty Affairs, Dep't of State (Dec. 1, 2017).

expedited parliamentary procedures of the Trade Act of 1974, 19 U.S.C. § 2101 *et seq.* To qualify for the Trade Act's procedures, an agreement must be subject to termination "upon due notice" at the end of a period specified in the agreement; if the agreement is not terminated at that time, "it shall be subject to termination or withdrawal thereafter upon not more than 6 months' notice." 19 U.S.C. § 2135(a). President Bush and the leaders of Canada and Mexico signed NAFTA on December 17, 1992. 32 I.L.M. at 703. Consistent with the Trade Act, article 2205 of NAFTA provides for withdrawal on six months' notice: "A Party may withdraw from this Agreement six months after it provides written notice of withdrawal to the other Parties. If a Party withdraws, the Agreement shall remain in force for the remaining Parties." NAFTA art. 2205, 32 I.L.M. at 703.

In 1993, President Clinton submitted to Congress the agreement itself, a "statement of administrative action" describing the Executive Branch's plan for implementing the agreement, and proposed implementing legislation. H.R. Doc. No. 103-159, vol. 1, at 1–2 (1993). The statement of administrative action discussed one potential withdrawal scenario. Reflecting the importance of supplemental agreements on labor and environmental issues to his Administration's support for NAFTA, President Clinton advised that if Mexico or Canada ever withdrew from one of those supplemental agreements, the President would, "after thorough consultation with the Congress, . . . provide notice of withdrawal under the NAFTA, and cease to apply that Agreement, to Mexico or Canada." *Id.* at 456. The President did not suggest that notice of withdrawal would be contingent on congressional approval or any other formal action.

Congress enacted the proposed implementing legislation later that year. *See* North American Free Trade Agreement Implementation Act ("NAFTA Implementation Act"), Pub. L. No. 103-182, 107 Stat. 2057 (1993). In that statute Congress "approve[d]" both NAFTA and the statement of administrative action. *Id.* § 101(a)(1)–(2), 107 Stat. at 2061 (codified at 19 U.S.C. § 3311(a)(1)–(2)). The Act changed U.S. law to comply with the international-law obligations that the United States would assume under NAFTA. The Act also authorized the President, if he determined that certain conditions had been satisfied, to take steps to "provid[e] for the entry into force" of the Agreement with Canada and

Mexico. 19 U.S.C. § 3311(b). President Clinton took those steps and NAFTA entered into force among the three countries on January 1, 1994. Office of the United States Trade Representative, Executive Office of the President, *North American Free Trade Agreement (NAFTA)*, https://ustr. gov/trade-agreements/free-trade-agreements/north-american-free-trade-agreement-nafta (last visited October 17, 2018).

## II.

### A.

The Constitution empowers the President, with the advice and consent of the Senate, to make treaties. U.S. Const. art. II, § 2, cl. 2. The Constitution does not expressly address the procedures by which the United States may enter other forms of international agreements. But from the earliest days of the Republic, it has been established that the President may, on behalf of the United States, "make such international agreements as do not constitute treaties in the constitutional sense." *United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 318 (1936); *see Weinberger v. Rossi*, 456 U.S. 25, 30 n.6 (1982) ("We have recognized . . . that the President may enter into certain binding agreements with foreign nations without complying with the formalities required by the Treaty Clause[.]"); *see also* Memorandum for Ambassador Michael Kantor, U.S. Trade Representative, from Walter Dellinger, Assistant Attorney General, Office of Legal Counsel, *Re: Whether the GATT Uruguay Round Must Be Ratified as a Treaty* at 2–3 (July 29, 1994); Memorandum for the Attorney General from J. Lee Rankin, Assistant Attorney General, Office of Legal Counsel, *Re: Constitutional Aspects of the General Agreement on Tariffs and Trade* at 26 (Nov. 19, 1954).

In some instances, the President may enter into such agreements based solely upon his own constitutional authority. These agreements include military truces, agreements to resolve foreign claims, and agreements recognizing a foreign power. *See, e.g.*, *Dames & Moore v. Regan*, 453 U.S. 654, 679–83 (1981); *United States v. Pink*, 315 U.S. 203, 229–30 (1942); *United States v. Belmont*, 301 U.S. 324, 330–31 (1937); Louis Henkin, *Foreign Affairs and the United States Constitution* 219–22 (2d ed. 1996) ("Henkin"). Such executive agreements may have legal force

without any legislative action. *See Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 415 (2003); *Dames & Moore*, 453 U.S. at 682–83; *Whether Uruguay Round Agreements Required Ratification as a Treaty*, 18 Op. O.L.C. 232, 244–45 (1994) ("*Uruguay Round Agreements*"); *Presidential Authority to Settle the Iranian Crisis*, 4A Op. O.L.C. 248, 249 (1980).

In other instances, the President may negotiate and conclude an international agreement that the full Congress approves through legislation (either in advance or after the agreement is concluded). Unlike a treaty, "which in a single instrument both constitutes an international obligation and may have the force of law, a congressional-executive agreement taking this form consists of two distinct instruments: the international agreement . . . concluded by the President, and the authorizing statute to which it is an incident[.]" Memorandum for Robert F. Hoyt, General Counsel, Dep't of the Treasury, from Steven G. Bradbury, Principal Deputy Assistant Attorney General, Office of Legal Counsel, *Re: President's Authority to Terminate or Amend a Certain Congressional-Executive Agreement* at 5 (May 9, 2008) ("2008 Bradbury Opinion"). The United States has frequently employed such congressional-executive agreements to assume major international trade obligations. *See Uruguay Round Agreements*, 18 Op. O.L.C. at 234–35; Richard S. Beth, Cong. Research Serv., R44584, *Implementing Bills for Trade Agreements: Statutory Procedures under Trade Promotion Authority* 2–3 (2016); *Restatement (Third) of the Foreign Relations Law of the United States* § 303 reporters' note 9 (Am. Law Inst. 1987) (noting that "agreements on [tariffs and other trade matters] are now commonly effected by Congressional-Executive agreement"). NAFTA is such an agreement. The President negotiated and concluded NAFTA, and Congress then approved it by enacting the NAFTA Implementation Act, which authorized the President to bring NAFTA into force for the United States.

### B.

You have asked whether the President may, without obtaining additional congressional authorization, exercise the right of the United States to withdraw from NAFTA. In the 2008 Bradbury Opinion, we addressed a similar question in response to a request from the Department of the Treasury regarding another congressional-executive agreement. Earlier

this year, we addressed this issue in another opinion about a different international agreement.[2] We provide the same answer today. Where an international agreement contains defined procedures for termination or withdrawal and Congress approves the agreement without limiting those procedures, the President may invoke the right of the United States to terminate or withdraw under those procedures without the need for additional congressional authorization. *See* 2008 Bradbury Opinion at 5.[3]

While there have been fewer occasions to consider the President's authority to terminate congressional-executive agreements, many precedents support the President's authority to terminate a treaty pursuant to its terms. That authority flows from the President's constitutional responsibility to "take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3, which includes the power to execute treaties, *see Constitutionality of the Rohrabacher Amendment*, 25 Op. O.L.C. 161, 169–70 (2001) ("*Rohrabacher Amendment*"); *Constitutionality of Legislative Provision Regarding ABM Treaty*, 20 Op. O.L.C. 246, 249 (1996). Thus, "[w]here the Senate has consented to a treaty that provides for its termination, it has consented to the President's implementing that provision, just as it has consented to his implementing other provisions of the treaty." 2008 Bradbury Opinion at 6. The termination provisions are "simply part of the treaty the President is authorized to execute, according to his discretion." *Id*.

The President's authority to terminate a treaty also follows from his role as "'the sole organ of the nation in its external relations, and its sole representative with foreign nations.'" *Curtiss-Wright*, 299 U.S. at 319 (quoting then-Rep. John Marshall, 10 Annals of Cong. 595, 613 (1800)). As the Supreme Court has observed, "the historical gloss on the 'executive Power' vested in Article II of the Constitution has recognized the

---

[2] Because this opinion may be published prior to that one, we fully explore the issue here rather than rely on our prior opinion as precedent.

[3] Bilateral agreements typically provide for a party to "terminate" the agreement; multilateral agreements typically provide a right of "withdrawal," since those agreements may remain in force for other parties. *See* Anthony Aust, *Modern Treaty Law and Practice* 245 (3d ed. 2013). The same legal principles that apply to the President's authority to terminate international agreements apply equally to his authority to withdraw, and so this memorandum uses the terms interchangeably, as appropriate.

President's 'vast share of responsibility for the conduct of our foreign relations.'" *Garamendi*, 539 U.S. at 414 (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 610–11 (1952) (Frankfurter, J., concurring)). The President has the "exclusive authority to determine the time, scope, and objectives of international negotiations." *Unconstitutional Restrictions on Activities of the Office of Science and Technology Policy in Section 1340(a) of the Department of Defense and Full-Year Continuing Appropriations Act, 2011*, 35 Op. O.L.C. __, at *4 (Sept. 19, 2011) ("*OSTP*") (internal quotation marks omitted). Thus, "[t]he President has the sole power to negotiate treaties, and the Senate may not conclude or ratify a treaty without Presidential action." *Zivotofsky v. Kerry*, 135 S. Ct. 2076, 2086 (2015) (citation omitted).[4]

The President's exclusive authority over diplomacy extends not only to the making of treaties, but to their maintenance as well. The Supreme Court has long recognized that "the execution of a contract between nations is to be demanded from, and, in the general, superintended by the executive of each nation[.]" *The Schooner Peggy*, 5 U.S. (1 Cranch) 103, 109 (1801). "'In the conduct of negotiations with foreign governments, it is imperative that the United States speak with one voice. The Constitution provides that that one voice is the President's.'" *Issues Raised by Foreign Relations Authorization Bill*, 14 Op. O.L.C. 37, 40 (1990) (quoting Message to the Senate Returning Without Approval the Bill Prohibiting the Export of Technology for the Joint Japan-United States Development of FS-X Aircraft (July 31, 1989), 2 *Pub. Papers of Pres. George Bush* 1042, 1043 (1989)); *cf. United States v. Louisiana*, 363 U.S. 1, 35 (1960) ("The President . . . is the constitutional representative of the

---

[4] Specifically, the President has the power "to make Treaties, provided two thirds of the Senators present concur," under Article II, Section 2, Clause 2 of the Constitution. The same clause of the Constitution empowers the President to "appoint Ambassadors," "Consuls," and other officers of the United States. Although some appointments require the Senate's advice and consent, the President alone has the power to remove the executive officers he appoints. *See Myers v. United States*, 272 U.S. 52, 122 (1926) ("The power of removal is incident to the power of appointment, not to the power of advising and consenting to appointment[.]"). Just as the textual requirement to obtain Senate approval for certain appointments does not imply any role for the Senate in removal, so too the fact that the Senate must concur in a treaty does not give the Senate any necessary role in treaty termination.

United States in its dealings with foreign nations."). As the Nation's chief representative abroad, the President has the authority to determine whether and when the United States should exercise its right to terminate treaties.

In evaluating the President's authority to terminate a treaty without action by Congress, we place "significant weight" on "accepted understandings and practice." *Zivotofsky*, 135 S. Ct. at 2091; *see NLRB v. Noel Canning*, 134 S. Ct. 2550, 2559 (2014) (noting that "long settled and established practice is a consideration of great weight in a proper interpretation of constitutional provisions regulating the relationship between Congress and the President" (internal quotation marks and brackets omitted)); *Dames & Moore*, 453 U.S. at 678–86 (describing "a history of congressional acquiescence in conduct of the sort engaged in by the President"). In this regard, however, historical practice has evolved over time. *See generally* Curtis A. Bradley, *Treaty Termination and Historical Gloss*, 92 Tex. L. Rev. 773, 788–99, 807–16 (2014). Although the President's authority to act unilaterally to terminate a treaty is now well established, there are a number of early examples involving alternative procedures for treaty termination, including "direct congressional action, congressional authorization or direction of presidential action, and senatorial authorization or approval." *Restatement (Fourth) of the Foreign Relations Law of the United States* § 113 cmt. c (Am. Law Inst., Tentative Draft No. 2, 2017); *see also id*. § 113 reporters' note 2 (collecting examples); Edwin S. Corwin, *The President: Office and Powers, 1787–1984*, at 226, 481 n.75 (5th rev. ed. 1984) (similar); Memorandum for the Secretary of State from Herbert J. Hansel, Legal Adviser, Dep't of State, *Re: President's Power to Give Notice of Termination of U.S.-ROC Mutual Defense Treaty* (Dec. 15, 1978), *reprinted in Termination of Treaties: The Constitutional Allocation of Power*, S. Comm. on Foreign Relations, 95th Cong. 395, 400–10 (Comm. Print 1978) ("1978 Legal Adviser Memo") (survey of historical practice).

While it would have been convenient had the Founders squarely addressed treaty termination in the constitutional text itself, we are left with no such clarity, and the appropriate division of authority between the President and Congress was hotly debated at the very start of the Republic. Here, as in other areas, "[a] Hamilton may be matched against a

Madison." *Youngstown*, 343 U.S. at 635 n.1 (Jackson, J., concurring). After President Washington issued a proclamation to maintain U.S. neutrality in France's war with Great Britain and other European powers, Hamilton and Madison famously divided over the President's powers, including over whether the President could suspend the treaty of alliance with France without congressional action. *Compare* Alexander Hamilton, *Pacificus* No. 1 (June 29, 1793) ("Hence in the case stated, though treaties can only be made by the President and Senate, their activity may be continued or suspended by the President alone."), *reprinted in* 15 *The Papers of Alexander Hamilton* 33, 42 (Harold C. Syrett et al. eds., 1969), *with* James Madison, *Helvidius* No. 3 (Sept. 7, 1793) ("Nor can [the President] have any more right to suspend the operation of a treaty in force as a law, than to suspend the operation of any other law."), *reprinted in* 15 *The Papers of James Madison* 95, 99 (Thomas A. Mason et al. eds., 1985).

When the United States terminated the treaty of alliance with France five years later, it did so only after an act of Congress. Following the XYZ Affair, Congress enacted a series of measures to authorize the Quasi-War with France, one of which included a declaration that "the treaties concluded with France," including the treaty of alliance, "shall not henceforth be regarded as legally obligatory on the government or citizens of the United States." Act of July 7, 1798, ch. 67, 1 Stat. 578, 578. There was some debate within Congress about whether that step fell within Congress's power. *See* David P. Currie, *The Constitution in Congress: The Federalist Period, 1789–1801*, at 251–52 (1997). Thomas Jefferson (siding with Madison's earlier view) opined that "[t]reaties being declared, equally with the laws of the U. States, to be the supreme law of the land, it is understood that an act of the legislature alone can declare them infringed and rescinded." Thomas Jefferson, *A Manual of Parliamentary Practice* § 52 (Samuel H. Smith 1801). The 1798 example, however, "appears to be the only instance in U.S. history in which the full Congress purported to effectuate a termination directly," Bradley, *Treaty Termination*, 92 Tex. L. Rev. at 789, and it might be justified as incident to the power of Congress to "declare War," U.S. Const. art. I, § 8, cl. 11; *see* Bradley, *Treaty Termination*, 92 Tex. L. Rev. at 789–90, 799 & n.143; William Rawle, *A View of the Constitution of the United*

*States of America* 68 (Philip H. Nicklin, 2d ed. 1829) ("Congress alone possesses the right to declare war; and the right to qualify, alter, or annul a treaty being of a tendency to produce war, is an incident to the right of declaring war.").[5]

The United States terminated two other treaties prior to the Civil War. In 1846, President Polk requested Congress's authorization to give notice to terminate a treaty with the United Kingdom concerning the Oregon territory. *See* Bradley, *Treaty Termination*, 92 Tex. L. Rev. at 790. Although Congress passed an act authorizing the President "at his discretion" to do so, Act of Apr. 27, 1846, ch. 4, 9 Stat. 109, 110, some legislators stated that the law was unnecessary because the President could act of his own authority or with Senate consent, *see* 1978 Legal Adviser Memo at 403–04; Cong. Globe, 29th Cong., 1st Sess. 159 (1846) (statement of Rep. Smith) (arguing that whether to give notice under the treaty "is a duty that belongs to the President, and he is responsible to the people for his discharge of it"). In 1855, after President Pierce announced his desire to terminate a Navigation Treaty with Denmark, the Senate alone provided him with authorization. Bradley, *Treaty Termination*, 92 Tex. L. Rev. at 793; *see* Franklin Pierce, Second Annual Message (Dec. 4, 1854), *in* 5 *A Compilation of the Messages and Papers of the Presidents* 273, 279 (James D. Richardson ed., 1897) ("*Papers of the Presidents*"). Again, some legislators questioned whether congressional involvement was necessary. 1978 Legal Adviser Memo at 404. Accordingly, prior to the Civil War, the United States had not settled on a clear

---

[5] In *Chirac v. Lessee of Chirac*, 15 U.S. (2 Wheat.) 259, 272 (1817), the Supreme Court referred to the 1798 Act as a "repeal" of the treaty of alliance. But that case addressed only the domestic effects of abrogating the treaty, where Congress's authority is well established, *see, e.g.*, *La Abra Silver Mining Co. v. United States*, 175 U.S. 423, 460 (1899); *Rohrabacher Amendment*, 25 Op. O.L.C. at 169, not whether Congress could terminate the treaty as a matter of international law. The Supreme Court has never decided that latter question, nor do we address it here. The 1798 Act led Attorney General Biddle to suggest that congressional action might be required to denounce a treaty, *see International Load Line Convention*, 40 Op. Att'y Gen. 119, 123 (1941), but that dictum does not represent the considered view of the Department of Justice. *See, e.g.*, 2008 Bradbury Opinion at 5 n.1; *Validity of Congressional-Executive Agreements that Substantially Modify the United States' Obligations Under An Existing Treaty*, 20 Op. O.L.C. 389, 395–96 n.14 (1996).

understanding as to the role of Congress and which legislative actor, the Senate or the full Congress, had the authority to authorize the action.[6]

Over the course of time, historical practice shifted towards the view that the President could terminate a treaty without congressional authorization. In some instances, the President effectuated the termination, but Congress or the Senate then authorized it. Thus, in 1864, in response to Confederate raids from Canada, President Lincoln provided notice to terminate the Great Lakes Agreement with Great Britain, pursuant to the agreement's notice provision. *See* Abraham Lincoln, Fourth Annual Message (Dec. 6, 1864), *in* 6 *Papers of the Presidents* 243, 246; *see also* 12 Charles I. Bevans, Ass't Legal Adviser, Dep't of State, *Treaties and Other International Agreements of the United States of America: 1776– 1949*, at 54 (1971) ("Bevans") (text of agreement). A fierce debate in the Senate ensued over whether President Lincoln had exceeded his constitutional powers in doing so and whether Congress could properly ratify his action.[7] In the end, however, Congress passed a joint resolution authorizing the President's action. Joint Resolution No. 13 of Feb. 9, 1865, 13

---

[6] In addition to these two examples, President Madison's Administration exchanged diplomatic correspondence in 1815 regarding the impact of the Napoleonic Wars on a commercial treaty between the United States and the Netherlands; although both countries later disputed the status of the treaty, the United States "successfully argued that it had been agreed by the Netherlands government and President Madison in 1815 to regard the treaty as terminated." 1978 Legal Adviser Memo at 402; *see* 2 *Foreign Relations of the United States, 1873*, at 720–24 (1873). Notwithstanding Madison's earlier views, his Administration did not seek or obtain congressional approval. There remains some debate, however, about whether the United States terminated the treaty, or whether the parties jointly recognized that the treaty had ceased to have effect. *Compare* Bradley, *Treaty Termination*, 92 Tex. L. Rev. at 796–97, *with* Myres S. McDougal & Asher Lans, *Treaties and Congressional-Executive or Presidential Agreements: Interchangeable Instruments of National Policy*, 54 Yale L.J. 181, 336 & n.127 (1945).

[7] *Compare* Cong. Globe, 38th Cong., 2d Sess. 312 (1865) (statement of Sen. Davis) ("[U]ntil it is ratified and confirmed by the action of Congress, as every gentleman acknowledges, [the President's notice] has no effect or operation whatever."), *and id*. (statement of Sen. Sumner) ("[A] treaty may be regarded as to a certain extent a part of the law of the land, to be repealed or set aside only as other law is repealed or set aside: that is, by act of Congress."), *with id*. at 313 (statement of Sen. Johnson) ("We know that under the Constitution of the United States, the only organ between the United States and foreign Governments is the Executive. They have nothing to do with the Congress of the United States or with the judiciary of the United States. The whole foreign relations of the country . . . are to be conducted by the President.").

Stat. 568. (The President later rescinded the notice of termination before the six months had expired. *See* H.R. Doc. No. 56-471, at 33–34 (1900) (reprinting diplomatic correspondence).) And in 1911, President Taft gave notice to Russia of his intent to terminate a commercial treaty according to its terms, and then submitted a resolution for "ratification and approval" of his action to the Senate. 48 Cong. Rec. 453 (1911). Congress enacted a joint resolution that "adopted and ratified" the President's action. Joint Resolution No. 1 of Dec. 21, 1911, 37 Stat. 627 (1911); Bradley, *Treaty Termination*, 92 Tex. L. Rev. at 795.

That Congress has played a role in terminating treaties does not demonstrate that the President lacks the unilateral authority to do so. Beginning with President McKinley in 1899, and growing over time, Presidents increasingly assumed the authority to terminate a treaty without approval by the Senate or the full Congress. Over the past century, "unilateral presidential termination of treaties has . . . become the norm." Bradley, *Treaty Termination*, 92 Tex. L. Rev. at 801. As relevant to the case of NAFTA, many of these withdrawals have involved commercial treaties. For example:

- In 1899, President McKinley gave notice to denounce portions of a commercial treaty with Switzerland, Nov. 25, 1850, 11 Stat. 587, on the ground that those provisions required trade concessions from the United States that the President deemed contrary to U.S. policy. *See* 1978 Legal Adviser Memo at 406.

- In 1936, President Roosevelt notified Italy of his intent to withdraw from an 1871 commercial treaty, on the ground that his Administration wished to take measures against prejudicial trade control measures imposed by Italy. *See id*. at 414–15.

- In 1962, President Kennedy gave notice of the termination of a 1902 commercial convention with Cuba pursuant to the terms of the treaty. *See id*. at 420–21.

- In 1985, President Reagan gave notice of the termination of a treaty of friendship, commerce, and navigation with Nicaragua according to its terms. *See* Treaties Terminated by the President, *2002 Digest of United States Practice in International Law*, ch. 4, § B(5)(b), at 204.

- In 1987, President Reagan gave notice of the termination of the United States-Netherlands Antilles Income Tax Convention, on the ground that it had facilitated tax evasion using accounts and companies based in the Antilles. *See id.*
- In 1995, President Clinton gave notice of the termination of a 1980 tax treaty with Malta, on the ground that recent changes in Maltese law allowed exploitation of the terms of the treaty. *See id.* at 203–04; Dep't of the Treasury, *United States Terminates Tax Treaty with Malta*, Treas. RR-717, 1995 WL 685012 (Nov. 20, 1995).
- In 2007, President George W. Bush gave notice to terminate a tax treaty with Sweden because Sweden had abolished the tax in question. Dep't of the Treasury, *United States Terminates Estate and Gift Tax with Sweden*, Treas. HP-436, 2007 WL 1724190 (June 15, 2007).
- In 2016, President Obama gave notice to withdraw the United States from the South Pacific Tuna Treaty in accordance with that treaty's withdrawal provision. *See* Treaty Amendment, *2016 Digest of United States Practice in International Law*, ch. 4, § B, at 149 ("*2016 Digest of U.S. Practice*").[8]

In view of these historical examples of presidential action, combined with what has usually been congressional acquiescence, there can no longer be serious doubt that the President may terminate a treaty in accordance with its terms. *See Validity of Congressional-Executive Agreements That Substantially Modify the United States' Obligations Under an Existing Treaty*, 20 Op. O.L.C. 389, 395 n.14 (1996) ("[T]he executive branch has taken the position that the President possesses the authority to terminate a treaty in accordance with its terms by his unilateral action[.]"); *Goldwater v. Carter*, 617 F.2d 697, 699–708 (D.C. Cir.) (en banc) (per curiam) (upholding President Carter's authority to terminate a mutual defense treaty with the Republic of China according to the treaty's terms), *vacated*, 444 U.S. 996 (1979); *Restatement (Fourth) of Foreign*

---

[8] After further negotiations, the United States rescinded its notice of withdrawal from the South Pacific Tuna Treaty also without seeking or obtaining Congress's approval. *See 2016 Digest of U.S. Practice* at 150.

*Relations Law* § 113(1) ("According to established practice, the President has the authority to act on behalf of the United States in . . . withdrawing the United States from treaties . . . on the basis of terms in the treaty allowing for such action (such as a withdrawal clause)[.]"); *id.* § 113 cmt. c ("Since [the end of the 19th century], almost all actions to . . . withdraw from treaties have been carried out on behalf of the United States by the President and his or her agents acting unilaterally." (citation omitted)); *Restatement (Third) of Foreign Relations Law* § 339 ("Under the law of the United States, the President has the power . . . to suspend or terminate an agreement in accordance with its terms[.]"); Henkin at 213–14 (explaining that it is now "accepted that the President has the authority to denounce or otherwise terminate a treaty"); Curtis A. Bradley, *Exiting Congressional-Executive Agreements*, 67 Duke L.J. 1615, 1623 (2018) (observing that the Senate "knows that presidents claim authority to invoke withdrawal clauses unilaterally" and "routinely consents to treaties containing such clauses"). In so concluding, we are mindful of the historical examples in which Congress or the Senate has played a role in treaty termination. *See, e.g.*, *Van der Weyde v. Ocean Transp. Co.*, 297 U.S. 114, 116 (1936). But such examples do not suggest that congressional approval is always required—especially since it has, as an historical matter, more often been lacking. The President therefore need not return to Congress before terminating or withdrawing from a treaty according to its terms.

## C.

There has been comparatively less discussion concerning the President's authority to terminate or withdraw from a congressional-executive agreement, as distinct from a treaty. However, we believe that the textual and structural reasoning described above, as well as the historical practice, applies "with equal force to the President's authority to terminate congressional-executive agreements according to their terms." 2008 Bradbury Opinion at 6. When the President invokes a termination provision in a congressional-executive agreement, he is implementing the laws that Congress has enacted and exercising his own foreign-affairs powers. In doing so, his powers are "unquestionably expansive, consisting of both the authority provided by Congress's authorizing legislation and the

President's considerable independent authority to act in the realm of foreign affairs." *Id*. In that field the President's action is "'supported by the strongest of presumptions and the widest latitude of judicial interpretation, and the burden of persuasion would rest heavily upon any who might attack it.'" *Dames & Moore*, 453 U.S. at 668 (quoting *Youngstown*, 343 U.S. at 637 (Jackson, J., concurring)).

It could be argued that the President may not unilaterally terminate a congressional-executive agreement because Congress approved the agreement by statute, and therefore, any changes would require a new statute. That argument parallels one made—ultimately unsuccessfully—in early debates on the President's authority to terminate treaties, which may also have the force of domestic law. *See, e.g.*, Madison, *Helvidius* No. 3 ("Nor can [the President] have any more right to suspend the operation of a treaty in force as a law, than to suspend the operation of any other law."), 15 *Papers of James Madison* at 99; Jefferson, *Manual of Parliamentary Practice* § 52 ("Treaties being declared, equally with the laws of the U. States, to be the supreme law of the land, it is understood that an act of the legislature alone can declare them infringed and rescinded."). Here too the argument fails. As explained above, a congressional-executive agreement "consists of two distinct instruments," both the international agreement and the authorizing statute to which it is incident. 2008 Bradbury Opinion at 5. When Congress approves an international agreement, that legislative act does not make the international agreement itself a statute. The international agreement remains a "distinct" instrument, *id*., entered into by the President "pursuant to his constitutional authority for conducting the Nation's foreign affairs," *Uruguay Round Agreements*, 18 Op. O.L.C. at 234; *see also* Bradley, *Congressional-Executive Agreements*, 67 Duke L.J. at 1632–34 (2018) (explaining that congressional-executive agreements "reflect a *combination* of congressional and presidential authority" and that "Congress has no authority to make binding international agreements"). Under international law, the mechanism for communicating treaty termination is typically "through an instrument communicated to the other parties" which only "the Head of State, Head of Government, or Minister for Foreign Affairs are presumed to have the authority to sign on behalf of the State." Vienna Convention on the Law of Treaties art. 67.2, *opened for signature* May 23, 1969, 1155 U.N.T.S. 331. The diplomatic

responsibility for communicating that notice would rest squarely with the President.

The President may thus terminate the international-law obligations of the United States under the terms of an agreement without additional action by Congress. The President's termination of the international agreement will not necessarily suspend the operation of any domestic implementing legislation. That question will depend upon the terms of the implementing legislation—whether, for example, Congress has provided that the statute should cease to have effect upon termination of the international agreement. The effect of termination on such implementing legislation, however, is a separate question from whether the President may terminate the international agreement and thereby relieve the United States of its international-law obligations. *See* Bradley, *Congressional-Executive Agreements*, 67 Duke L.J. at 1634 (noting that even if implementing legislation remains in force, that "does not itself disallow a presidential termination" of the international agreement, just as the President may terminate an Article II treaty that has been implemented by legislation).

It could also be argued that the President must seek congressional approval in terminating an international trade agreement because Congress approved the agreement under its broad authority to "regulate Commerce with foreign Nations." U.S. Const. art. I, § 8, cl. 3. But many treaties have dealt with "matters that were subject to legislation," including international trade, Henkin at 195; *see also supra* pp. 11–12 (discussing examples), and that fact has never been thought to disable the President from terminating a treaty without obtaining additional congressional authorization. *See, e.g.*, Bradley, *Congressional-Executive Agreements*, 67 Duke L.J. at 1630 (identifying examples from 1936 and 1985). Given the President's powers in this area, there is no good reason to believe that the Constitution preserves any greater role for Congress in the termination of a congressional-executive agreement on international trade than on any other subject matter. *See id.* at 1638. It is therefore entirely congruent with the constitutional design for the President to carry out the termination provisions consistent with the agreement as approved by Congress.

Finally, the historical practice over the past century once again weighs in favor of presidential authority. While examples involving congression-

al-executive agreements are not as numerous as those involving treaties, Presidents have invoked the right of the United States to withdraw from such agreements on a number of occasions. In 1975, the Ford Administration gave "notice of the intention of the United States to withdraw from the International Labor Organization" ("ILO"), which the United States had joined pursuant to a congressional-executive agreement, in accordance with a provision in the ILO constitution requiring two years' notice of withdrawal. Membership and Representation, *1975 Digest of United States Practice in International Law*, ch. 2, § 4(C), at 71 (quoting Secretary of State Kissinger's letter to the ILO).[9] The authorizing legislation did not limit the President's authority to withdraw, and President Ford did not seek congressional approval. 1978 Legal Adviser Memo at 423. Indeed, it appears that "the issue of Congressional approval was not raised in either House of the Congress, despite the fact that a number of members of the Senate and House did not favor withdrawal from the ILO." *Id*.

Similarly, in 1983, without seeking congressional approval, the Reagan Administration gave notice to withdraw the United States from the United Nations Educational, Scientific and Cultural Organization ("UNESCO") in accordance with "the terms of Article Two Paragraph Six of the [UNESCO] Constitution." Letter from George P. Shultz, Secretary of State, to Amadou-Mahtar M'Bow, Director General, UNESCO (Dec. 28, 1983), *reprinted in* 84 Dep't of State Bull. 41, 41 (Feb. 1984); *see also* Amendments to the Constitution of the United Nations Educational, Scientific and Cultural Organization, Dec. 8, 1954, T.I.A.S. No. 3469 (amending UNESCO constitution to provide for withdrawal upon notice). As with the ILO, Congress had approved U.S. membership in UNESCO by statute. *See* Pub. L. No. 79-565, § 1, 60 Stat. 712, 712 (1946) (codified

---

[9] The United States joined the ILO in 1934. *See* Pub. Res. No. 73-43, § 1, 48 Stat. 1182, 1182 (1934) (codified at 22 U.S.C. § 271); Proclamation of President Franklin D. Roosevelt, Sept. 10, 1934, 49 Stat. 2712 (1934). The ILO constitution was later amended to add a withdrawal provision, and the President submitted the amended constitution to Congress, which approved it. *See* Instrument for the Amendment of the Constitution of the International Labor Organization, annex art. 1(5), Apr. 20, 1948, 62 Stat. 3485, 3494 (providing that "[n]o Member . . . may withdraw from the [ILO] without giving notice," and that such notice "shall take effect two years after the date of its reception"); H.R. Rep. No. 80-1057, at 10 (1947) (transmittal of the amended constitution); Pub. L. No. 80-843, § 1, 62 Stat. 1151, 1151 (1948) (congressional approval).

at 22 U.S.C. § 287m); Constitution of the United Nations Educational, Scientific and Cultural Organization, Nov. 16, 1945, 61 Stat. 2495, 2519 (1946). President Reagan's notice took effect, and the United States withdrew, on December 31, 1984. *See* Message to the Congress Transmitting the Annual Report on International Activities in Science and Technology (Mar. 20, 1985), 1 *Pub. Papers of Pres. Ronald Reagan* 319, 321 (1985).

The United States rejoined UNESCO in 2002. *See* Address to the United Nations General Assembly in New York City (Sept. 12, 2002), 2 *Pub. Papers of Pres. George W. Bush* 1572, 1572 (2002). On October 12, 2017, the Trump Administration again gave notice that the United States intended to withdraw. *See* Heather Nauert, Dep't of State, Press Release, *The United States Withdraws from UNESCO* (Oct. 12, 2017), https://www.state.gov/r/pa/prs/ps/2017/10/274748.htm (stating that, "[p]ursuant to Article II(6) of the UNESCO Constitution, U.S. withdrawal will take effect on December 31, 2018"). Once again, the President did not seek congressional approval.

Presidents have also terminated international agreements for which Congress provided advance statutory authorization, without seeking congressional approval for the termination. *See, e.g.*, Diplomatic Note to the Secretariat of Foreign Relations, Mexico, from the U.S. Embassy at 1 (June 28, 2012) (notice to terminate 1972 agreement on screwworm eradication); Diplomatic Note to the Ministry of Foreign Affairs of Japan from the U.S. Embassy at 1 (Dec. 17, 2004) (notice to terminate 1987 textile trade agreement); U.S. Trade Representative, Press Release, *U.S. Files WTO Case Against EU Over Unfair Airbus Subsidies* (Oct. 10, 2004) (notice to terminate 1992 agreement implementing 1979 agreement on trade in civil aircraft); Proclamation No. 2763, 12 Fed. Reg. 8866, 8866–67 (1946) (notice to terminate five bilateral trade agreements); Bradley, *Congressional-Executive Agreements*, 67 Duke L.J. at 1638 & n.95 (citing examples from the Johnson, Eisenhower, and Truman Administrations); Randall H. Nelson, *The Termination of Treaties and Executive Agreements by the United States: Theory and Practice*, 42 Minn. L. Rev. 879, 880–81 n.7 (1958) (collecting additional examples).[10] Some of those

---

[10] For the respective statutory bases of these congressional-executive agreements, see 21 U.S.C. § 114b (1970) (screwworm agreement); 7 U.S.C. § 1854 (1982) (textile agree-

actions concerned termination by mutual consent of the parties or by the supersession of a later agreement. *See, e.g.*, *2016 Digest of U.S. Practice* at 477 (supersession of 1960 U.S.-Mexico air transportation services agreement by new agreement); 49 U.S.C. § 1462 (1958) (statutory basis for 1960 agreement). But even these precedents illustrate the established practice of the President ending congressional-executive agreements without involving Congress.

While history provides ample precedent for the President's authority to withdraw without congressional approval, it is also true that, as with treaties, there have been instances where Congress purported to direct the termination of congressional-executive agreements. The Comprehensive Anti-Apartheid Act of 1986, for example, provided that "[t]he Secretary of State shall terminate" an air services agreement with South Africa, Pub. L. No. 99-440, § 306(b)(1), 100 Stat. 1086, 1100, an agreement which Congress had authorized, *see* 49 U.S.C. § 602 (1940). The Secretary of State then terminated the agreement. *See South African Airways v. Dole*, 817 F.2d 119, 121 (D.C. Cir. 1987); *see also infra* p. 23 (discussing example in which Congress purported to reserve for itself the power to "annul" mail privileges Congress authorized the President to extend to Mexico and Canada by international agreement); Walter McClure, *International Executive Agreements* 29 (1941) (noting congressional authorization in 1923 for the termination of certain executive agreements relating to the Panama Canal, which Congress had ratified). But, as with treaties, such examples suggest only that Congress has sometimes sought to play a

---

ment); 19 U.S.C. § 2503(c)(10) (1982) (aircraft trade agreement); 19 U.S.C. § 1351 (1940) (bilateral trade agreements). In addition to these examples, President Kennedy gave notice in 1962 to terminate a 1934 trade agreement with Cuba. 1978 Legal Adviser Memo at 421; *see also* 6 Bevans at 1163 & n.5. The 1934 trade agreement was a congressional-executive agreement: President Roosevelt had entered into it pursuant to the Tariff Act of 1930. *See* Reciprocal Trade Agreement, Cuba-U.S., Aug. 24, 1934, 49 Stat. 3559, 3559 (1936); *see also id*. art. XVII, 49 Stat. at 3568–69 (termination provision). The United States and Cuba had suspended the 1934 trade agreement in 1947 but had reserved each country's right to terminate it. *See* Exclusive Agreement Between the United States of America and the Republic of Cuba Supplementary to the General Agreement on Tariffs and Trade, Cuba-U.S., ¶ 1, Oct. 30, 1947, 61 Stat. 3699, 3700; Exchange of Letters, Cuba-U.S., Oct. 30, 1947, T.I.A.S. No. 1703, *in* 6 Bevans at 1231–33. When President Kennedy terminated the agreement pursuant to that reservation of rights, he did so without seeking congressional approval. 1978 Legal Adviser Memo at 421.

role in the process, not that congressional approval is necessary. Where Congress has not sought to involve itself in the process, the President is not constitutionally required to seek congressional approval before invoking the terms of a congressional-executive agreement to terminate or withdraw from the agreement.

### III.

In view of the principles discussed above, we have no difficulty concluding that the President has the authority, without further action by Congress, to give notice on behalf of the United States to withdraw from NAFTA according to its terms. NAFTA contains an express mechanism for withdrawal, and nothing in the NAFTA Implementation Act or any other statute purports to limit the President's authority to carry out that mechanism.

President Bush conducted the negotiations that led to NAFTA under the authority granted to him by Article II and consistent with the procedures specified by Congress to make the trade agreement eligible for fast-track consideration, *see* 19 U.S.C. §§ 2902–2903, and he signed NAFTA on behalf of the United States in 1992. NAFTA provides that "[a] Party may withdraw from this Agreement six months after it provides written notice of withdrawal to the other Parties." NAFTA art. 2205, 32 I.L.M. at 703. Congress "approve[d]" NAFTA in its entirety and without reservation, including article 2205. *See* 19 U.S.C. § 3311(a)(1). Pursuant to the NAFTA Implementation Act, *id.* § 3311(b), President Clinton directed an exchange of notes with Canada and Mexico and provided for NAFTA's "entry into force on January 1, 1994." Memorandum on Implementation of NAFTA (Dec. 27, 1993), 2 *Pub. Papers of Pres. William J. Clinton* 2206, 2206 (1993).

As the constitutional actor with "exclusive prerogatives in conducting the Nation's diplomatic relations," *OSTP*, 35 Op. O.L.C. __, at *4, the President may invoke NAFTA's withdrawal provision on behalf of the United States to communicate the notice of withdrawal to Canada and Mexico. The President's role as the agent of the United States in conducting diplomacy, coupled with his constitutional responsibility to execute the laws, justifies "presum[ing] (at least absent evidence to the contrary) that Congress, in approving an international agreement . . . , intended for the President to administer the agreement in accordance with its terms."

2008 Bradbury Opinion at 8 (citing *Goldwater*, 617 F.2d at 708). No language in the NAFTA Implementation Act limits his authority to do so, or rebuts the presumption that, "in approving an international agreement" like NAFTA, Congress "intended for the President to administer the agreement in accordance with its terms." *Id*. A presidential act withdrawing from NAFTA under the terms of article 2205 would therefore be supported by both the President's own independent foreign-affairs authority and Congress's approval through the NAFTA Implementation Act—putting the President's authority at its constitutional zenith. *See Youngstown*, 343 U.S. at 635 (Jackson, J., concurring).

Other provisions in the statute confirm that Congress left the President broad discretion to implement the agreement. Congress expected the President, for example, to exchange notes with Canada and Mexico to make NAFTA effective, and to determine whether those countries had implemented sufficient changes to their domestic laws to permit NAFTA to enter into force. 19 U.S.C. § 3311(b)(1)(A). Congress charged the Executive Branch with administering NAFTA and its authorizing statute through appropriate proclamations, regulations, and other executive action. *Id.* §§ 3314, 3331, 3332(q), 3372. Congress's broad delegations to the President of the authority to take action consistent with NAFTA and its implementing statute presumptively include the power to invoke the agreement's withdrawal provision. *See* 2008 Bradbury Opinion at 8. The delegations reflect "congressional acceptance of a broad scope for executive action," *Dames & Moore*, 453 U.S. at 677, in the administration of NAFTA, including in making determinations about whether and when to withdraw from that agreement.

Indeed, far from restricting that authority, the relevant provisions of the NAFTA Implementation Act authorize the President to take any and all actions consistent with NAFTA's terms. In the Act, Congress "approve[d]" "the statement of administrative action" that President Clinton submitted along with NAFTA. 19 U.S.C. § 3311(a)(2). That statement had explained that the President would, after "consultation" with Congress, invoke article 2205 to withdraw the United States from NAFTA if Mexico or Canada failed to abide by three supplemental agreements. H.R. Doc. No. 103-159, vol. 1, at 456. And even that pledge to consult with Congress before withdrawing from the agreement was not compelled by anything in the NAFTA Implementation Act. The Act requires the President to consult with Congress in many instances before exercising his

authority to proclaim tariffs and other matters under the NAFTA Implementation Act. *See, e.g.*, 19 U.S.C. § 3313(a). But the Act does not call for consultation before the President makes a decision to withdraw from NAFTA. The NAFTA Implementation Act thus confirms that the President may withdraw from the Agreement without obtaining congressional approval.[11]

Had Congress sought to restrict the President's discretion in this regard, it would have said so expressly. The NAFTA Implementation Act is filled with provisions anticipating that NAFTA might cease to be effective as between the United States and Canada or Mexico (e.g., through withdrawal). Yet none restricts the President's power to invoke NAFTA's withdrawal provision. Section 2, for example, generally defines the term "NAFTA country" to mean:

> (A) Canada for such time as the Agreement is in force with respect to, and the United States applies the Agreement to, Canada; and
>
> (B) Mexico for such time as the Agreement is in force with respect to, and the United States applies the Agreement to, Mexico.

19 U.S.C. § 3301(4). Section 109(b), entitled "Termination of NAFTA Status," provides that, "[d]uring any period in which a country ceases to be a NAFTA country, sections 101 through 106 shall cease to have effect with respect to such country." *Id.* § 3311 note. Section 415 similarly provides that title IV of the NAFTA Implementation Act, governing dispute resolution between the parties to the agreement, generally "shall cease to have effect" with respect to a country "on the date on which a country ceases to be a NAFTA country." *Id.* § 3451; *see also* NAFTA Implementation Act § 203(b)(1), 107 Stat. at 2088 (amending 19 U.S.C. § 1311 to provide a rule for drawback of certain duties "[i]f Canada ceases to be a NAFTA country"); *id.* § 203(b)(2)(B) & (C), (b)(3), (b)(4)(B), (b)(5)(A)(i), 107 Stat. at 2089–91 (making similar amendments

---

[11] We note that there is at least one statement in the legislative history suggesting that congressional approval may be required. *See* 139 Cong. Rec. 29,784 (1993) (statement of Rep. Franks) ("[U]nder article 2205, each country has the opportunity to withdraw from NAFTA. All it would require for U.S. withdrawal, is a vote of the Congress and 6 months [sic] notice."). That statement, however, finds no support in either article 2205 or the NAFTA Implementation Act, so we do not rely upon it.

to other provisions). Congress plainly anticipated these possibilities, yet did not purport to restrict the President's authority to bring them about.

Congress in fact has acknowledged the President's authority to exercise the termination right of the United States under the free trade agreement with Canada that preceded NAFTA. Before reaching the NAFTA deal, the United States and Canada entered into a bilateral free trade agreement, CFTA, which Congress approved by statute. *See* United States-Canada Free-Trade Agreement Implementation Act of 1988 ("CFTA Implementation Act"), Pub. L. No. 100-449, § 101(a)(1), 102 Stat. 1851, 1852 (codified at 19 U.S.C. § 2112 note). The agreement allowed either party to terminate on six months' notice if the parties failed to agree in the future on revised rules for certain duties. United States-Canada Free-Trade Agreement, Can.-U.S., art. 1906, Dec. 22, 1987–Jan. 2, 1988, 27 I.L.M. 293, 390. Section 410(a) of the implementing law required the President to submit a report "if the President decide[d] not to exercise the rights of the United States . . . to terminate" the agreement under that provision. 102 Stat. at 1897. No provision of the CFTA Implementation Act expressly conferred upon the President the authority to exercise the right of the United States to terminate, but this reporting requirement unequivocally confirms that Congress believed such authority rested with the President. There is every reason to think (and no reason to doubt) that Congress embraced a similar understanding with respect to the United States' parallel withdrawal right under NAFTA.

The 1988 Act and the Trade Act of 1974 are similarly consistent with this understanding of the President's withdrawal authority. NAFTA's negotiations were consistent with the statutory frameworks, and it was approved under both statutes. Section 125(a) of the Trade Act requires that trade agreements "entered into under [the Trade Act] shall be subject to termination, . . . or withdrawal, upon due notice, at the end of a period specified in the agreement." 19 U.S.C. § 2135(a). Section 125(b) provides the President with broad authority to "at any time terminate . . . any proclamation made under" it, but does not speak to the termination of trade agreements. *Id.* § 2135(b). In both the Trade Act and the 1988 Act, Congress specified that congressional approval would be required for certain kinds of trade agreements to "enter into force with respect to the United States." *Id.* §§ 2112(e), 2903(a)(1). Congress did not, however, reserve a similar role for itself in the process of *withdrawing* from any such agreements. Indeed, "[v]arious forms of this trade legislation date back at least

to the Trade Act of 1930, and yet in the succeeding eighty-eight years Congress has never sought to limit presidential termination in this legislation." Bradley, *Congressional-Executive Agreements*, 67 Duke L.J. at 1635. And section 102(a) of the Trade Act encourages the President "to take all appropriate and feasible steps within his power (including the full exercise of the rights of the United States under international agreements)" to eliminate distortions of international trade, once again reflecting the background assumption that the President "exercise[s] . . . the rights of the United States" under its international agreements. 19 U.S.C. § 2112(a).

In other cases, Congress has been explicit when it sought to play a role in the termination of international agreements authorized by statutes. "For example, in 1960 Congress authorized the President to enter into postal agreements with Mexico and Canada that would extend to those nations the privilege of transporting mail over United States territory." 2008 Bradbury Opinion at 9. Congress "provided that 'the President or Congress may annul the privilege at any time.'" *Id*. (quoting Pub. L. No. 86-682, sec. 1, § 6103, 74 Stat. 578, 688 (1960)). That and other examples demonstrate that Congress "is readily capable of indicating its intention to have a role by statute in the termination of agreements it has authorized." *Id*. Yet it did not do so in implementing NAFTA.[12]

We conclude therefore that, consistent with long-standing executive branch practice and the NAFTA Implementation Act, the President may invoke article 2205 of NAFTA to withdraw from the agreement in six months, without obtaining congressional approval. That withdrawal, once it took effect, would mean that the United States is no longer bound by NAFTA as a matter of its international obligations.

## IV.

Withdrawing from NAFTA would also have consequences under U.S. domestic law. For instance, many provisions of the NAFTA Implementation Act apply to "a NAFTA country" or "NAFTA countries." *See, e.g.*, 19 U.S.C. §§ 3311 note, 3333, 3334, 3335, 3371, 3372, 3391(b)(1). Sec-

---

[12] Because Congress did not purport to limit the President's authority to terminate NAFTA, we have no occasion to address constitutional limits on Congress's ability to do so.

tion 2(4) provides that Canada and Mexico are each a "NAFTA country," and thus entitled to receive certain trade benefits prescribed throughout the Act, "for such time as the Agreement is in force with respect to, *and the United States applies the Agreement to*," each country. *Id.* § 3301(4) (emphasis added). After withdrawing from NAFTA, the United States would no longer be "appl[ying]" the agreement to either country, and therefore, they would cease to be NAFTA countries for purposes of the Act.

The fact that the President's invocation of article 2205 could trigger that event is unremarkable. When the President terminates a self-executing treaty, the domestic-law consequence is similar, and the Supreme Court has long recognized that Congress may authorize the President to execute the law in a manner that terminates the legal effect of statutory provisions. *See Marshall Field & Co. v. Clark*, 143 U.S. 649, 690–91 (1892) (discussing "the sanction of many precedents in legislation" that "invest the president with large discretion in matters arising out of the execution of statutes relating to trade and commerce with other nations"); *see also, e.g.*, *The Orono*, 18 F. Cas. 830, 830 (C.C.D. Mass. 1812) (No. 10,585) (Story, Circuit Justice) (upholding the President's statutory authority to drop trade restrictions against Great Britain and France upon finding that those countries had modified edicts harmful to U.S. trade); Department of Defense Appropriations Act, 1991, Pub. L. No. 101-511, § 8105(d)(2), 104 Stat. 1856, 1902 (1990) (codified as amended at 10 U.S.C. § 113 note) (authorizing the President to waive statutory limits capping the number of troops stationed in Japan); 22 U.S.C. § 2370a(g) (providing that the President may "waive" prohibitions on foreign assistance to foreign nations that wrongfully expropriate property of Americans); 50 U.S.C. § 4305(a) (authorizing the President to "suspend" prohibitions on trade with an ally of an enemy of the United States during wartime). Thus, in providing notice under article 2205, the President would be acting pursuant to the terms of the agreement and would be both carrying out legislation that Congress properly authorized him to implement and exercising his foreign-affairs powers. He would be executing the laws, not unmaking them.

Finally, while the President's authority to withdraw under article 2205 is based upon his Article II authority, in addition to the statute, the Supreme Court has made clear that in the field of foreign affairs, Congress may delegate broad discretion to the Executive. When the President acts

"as the sole organ of the federal government in the field of international relations," the Constitution does not require Congress "to lay down narrowly definite standards by which the President is to be governed." *Curtiss-Wright*, 299 U.S. at 320, 322; *see also Zivotofsky*, 135 S. Ct. at 2089 (recognizing that, under *Curtiss-Wright*, "Congress may grant the President substantial authority and discretion in the field of foreign affairs"); *Youngstown*, 343 U.S. at 636 n.2 (Jackson, J., concurring) ("[T]he strict limitation upon congressional delegations of power to the President over internal affairs does not apply with respect to delegations of power in external affairs."). Many volumes "of the United States Statutes contain[] one or more acts or joint resolutions of Congress authorizing action by the President in respect of subjects affecting foreign relations, which either leave the exercise of the power to his unrestricted judgment, or provide a standard far more general than that which has always been considered requisite with regard to domestic affairs." *Curtiss-Wright*, 299 U.S. at 324.

In this opinion, we do not address the full range of domestic-law implications that would follow from the United States' withdrawal from NAFTA. Please let us know if we can be of any further assistance in this or any other regard.

STEVEN A. ENGEL
*Assistant Attorney General*
*Office of Legal Counsel*